NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2015-0499


THOMAS REID

v.

NEW HAMPSHIRE ATTORNEY GENERAL

Argued:  June 9, 2016
Opinion Issued:  December 23, 2016


Reid Law, PLLC, of Concord (Thomas Reid on the brief and orally), for the plaintiff.


Joseph A. Foster, attorney general (Francis C. Fredericks, assistant attorney general, and Nancy Smith, senior assistant attorney general, on the brief, and Mr. Fredericks orally), for the defendant.


LYNN, J.  The plaintiff, Thomas Reid, appeals the decision of the Superior Court (Smukler, J.) denying his petition under the Right-to-Know Law, RSA chapter 91-A, to compel the defendant, New Hampshire Attorney General Joseph Foster, to produce unredacted records of the Attorney

General's investigation into alleged wrongdoing by former Rockingham County Attorney James Reams. We vacate and remand.

I

The pertinent facts are as follows. Prior to November 6, 2013, the plaintiff served as the Deputy County Attorney for Rockingham County under County Attorney Reams. On that date, the defendant, claiming to act under authority granted by RSA 7:6 (2013), 7:11 (2013), and 7:34 (2013), suspended the criminal law enforcement authority of the county attorney. Simultaneously, the defendant placed the plaintiff on paid suspension. At the defendant's request, the Rockingham County Commissioners barred Reams from entering his office. It appears from the plaintiff's allegations and a memorandum of law filed by the county commissioners in a related case that the plaintiff also was barred from the Rockingham County Attorney's Office at the defendant's behest. Also at the defendant's request, the superior court appointed an assistant attorney general to serve as interim county attorney for Rockingham County. See RSA 7:33 (2013). The defendant, acting in conjunction with the U.S. Attorney's Office and the Federal Bureau of Investigation, conducted a criminal investigation of Reams that lasted until approximately March of 2014. The plaintiff resigned his position as deputy county attorney on January 17, 2014.

While the criminal investigation was ongoing, Reams instituted lawsuits against the defendant and the county commissioners, asserting that their actions were unlawful and seeking reinstatement to his position as county attorney and access to his office. Based, in part, on the ongoing criminal investigation, the Superior Court (McNamara, J.) denied Reams's requests for preliminary injunctive relief and to conduct discovery.

On March 11, 2014, the defendant and the county commissioners filed a complaint asking the superior court to remove Reams from office pursuant to RSA 661:9, IV (2008). On March 26, the defendant informed the trial court that the criminal investigation had been concluded and that no criminal charges had been or would be brought against Reams. Because the criminal investigation was concluded, the trial court determined that there was no need for discovery in Reams's lawsuits seeking reinstatement to office.

By order of April 10, 2014, the court ruled that Reams's continued suspension from office was unlawful, and that he must be reinstated as Rockingham County Attorney and allowed access to his office. The court stayed its order for thirty days so as to permit the attorney general and the county commissioners to appeal and request a further stay from this court. The attorney general and the county commissioners did appeal to this court

2

and sought an extension of the stay—relief which we denied.[1]  On June 18, 2014, both proceedings were settled.

On April 17, 2014, the plaintiff submitted a request for disclosure of the defendant's records concerning the investigation of Reams.  Specifically, the plaintiff sought the following materials:

- investigative reports, interview notes, memos, emails, recordings or other records relied upon as the basis for suspending the plaintiff's law enforcement authority;
- a recitation of all information possessed by the defendant on November 6, 2013, that led him to conclude that a criminal investigation of Reams should be initiated;
- all information, documents and records that justified the assignment of a state trooper to the Rockingham County Courthouse over the evening of November 6 - 7, 2013, to prevent tampering with records;
- information clarifying whether the county commissioners barred him from his office on their own initiative or at the request of the attorney general;
- copies of any and all warrants, consents, or reports pertaining to the search of the plaintiff's office and the seizure of items therefrom, a listing of the seized items, and return of said items to the plaintiff;
- records, interviews or reports reflecting any acts of discrimination that occurred at the Rockingham County Attorney's Office during the years 2012 and 2013;
- any and all information related to a 2012 call to the Attorney General's Office by Rockingham County Commissioner Barrows with respect to a referral to the County Human Resources Department of a retaliation claim against a County Attorney's Office employee for an earlier discrimination complaint made by the employee's girlfriend (also a County Attorney's Office employee) against Reams, as well as information concerning leaks about the Human Resources investigation made to the press and/or to State Representative Laura Pantelakos; and
- any and all documents, interviews or records showing that Reams had retaliated against any County Attorney's Office

---

[1] See Rockingham County Attorney v. Rockingham County Commissioners; Rockingham County Attorney v. New Hampshire Attorney General, No. 2014-0247 (N.H. April 24, 2014).  Our order did, however, stay processing of the appeal pending the conclusion of the removal action in the superior court.  We ruled that if the court's final decision in the removal action was appealed to this court, we would consolidate the appeals in both cases, and that if the removal action was not appealed, we would then reactivate the appeal in Case No. 2014-0247 at the request of the appellants.

employee as a result of the 2012 County Human Resources Department investigation or showing that there was reason to believe employees of the County Attorney's Office would be retaliated against if Reams was allowed to return to his position.

In a second request to the defendant, dated April 24, 2014, the plaintiff sought additional materials, including:

- all records, reports or interviews related to Reams's alleged modification of the supervisory duties of a County Attorney's Office employee who, in 1999, had complained to the Attorney General's Office about the sexual harassment of female employees by Reams, as well as records regarding Reams's alleged actions in causing this employee to be terminated from another job she held after leaving the County Attorney's Office; and
- the return to the plaintiff of the personal and supervisory notes he had compiled during his tenure as Deputy County Attorney.

The defendant timely responded to the requests, indicating that he would require a minimum of 30 days to compile and review the requested records. See RSA 91-A:4, IV (2013). When no further response was received from the defendant for a period of approximately seven months, the plaintiff instituted the present action. The defendant moved to dismiss, acknowledging that he had not timely supplemented his initial response, but arguing that he had otherwise acted reasonably and had not improperly withheld any information. The defendant represented that, as of December 20, 2014, he had begun the first phase of a "rolling production" of materials that consisted of the disclosure of 1293 pages of documents. The defendant requested that the court review in camera materials that he had submitted or proposed to submit in redacted form, so as to determine the propriety of the redactions.

By order dated January 14, 2015, the trial court ruled that the defendant had violated the Right-to-Know Law by failing to timely supplement his response to the plaintiff's requests. As relief, the court awarded the plaintiff his costs. However, the court declined to review redacted documents in camera. Instead, it directed the defendant to provide a "thorough affidavit" supporting his redactions, which the court indicated it would review to determine whether the defendant had sustained his burden of proof.[2]

---

[2] The court also denied the plaintiff's request for the assessment of a civil penalty, finding that the defendant had not acted in bad faith. In addition, the court denied the plaintiff's request for attorney's fees on the grounds that the plaintiff was self-represented.

4

The defendant responded by filing a final status report, affidavit, and request for dismissal on February 13, 2015. The affidavit, by Associate Attorney General Anne Edwards, identified the following nine legal bases upon which information had been withheld or redacted: (1) personnel information, under RSA 91-A:5, IV; (2) medical information, under RSA 91-A:5, IV; (3) grand jury records, under RSA 91-A:5, I; (4) financial information, under RSA 91-A:5, IV; (5) "[i]ndividual citizens' private information," the disclosure of which would constitute an invasion of privacy, under RSA 91-A:5, IV; (6) drafts, under RSA 91-A:5, IX; (7) notes, under RSA 91-A:5, VIII; (8) attorney work product, under RSA 91-A:5, IV and VII; and (9) confidential records, under RSA 91-A:5, IV and RSA 651:5. A master list of Bates-numbered documents, submitted as an exhibit to the affidavit, indicated which one or more of the foregoing legal bases for exemption was claimed for each document or category of documents listed. Finally, the defendant requested that the case be dismissed because, it claimed, it had "now responded fully to Mr. Reid's request and the Court Order" of January 14, 2015.

The plaintiff objected, and requested, among other things, additional time "to review the voluminous materials and provide a more comprehensive status report." The request for additional time was granted and, thereafter, the plaintiff filed a motion to compel production of a complete index of records and a motion to compel production of unredacted documents. In his motion to compel production of documents, the plaintiff specifically challenged only one of the defendant's asserted bases of exemption; namely, the exemption claimed under RSA 91-A:5, IV for "personnel information." The defendant objected to both motions.

On July 10, 2015, the trial court denied the plaintiff's motions. The court denied the motion for production of a more detailed index "[b]ecause the defendant has already complied with a previous court order requiring production of an index." It denied the motion to compel production of unredacted documents on the basis that the documents sought were exempt from disclosure under the Right-to-Know Law. Specifically, the court ruled:

> Here, the records at issue relate to the defendant's investigation into misconduct alleged to have been committed by Reams. This investigation, which was conducted jointly with Rockingham County, consisted of interviews with present and former employees. The subject directly involved the Rockingham County Attorney's Office's personnel practices, including specific instances of conduct involving employee discipline and certain reports to the Rockingham County . . . human resources office.

The court concluded that "[t]he defendant's redactions fall within the purview of RSA 91-A:5, IV." This appeal followed.

5

## II

On appeal, the plaintiff argues: (1) that the trial court's ruling violates Part I, Article 8 of the New Hampshire Constitution; (2) that the trial court erred in determining that the investigative records at issue were "[r]ecords pertaining to internal personnel practices," RSA 91-A:5, IV (2013), because the attorney general's investigation cannot be considered "internal"; and (3) that the trial court erred in finding that the attorney general's investigation of Reams was "conducted jointly with Rockingham County." "Because we decide cases on constitutional grounds only when necessary," Chatman v. Strafford County, 163 N.H. 320, 322 (2012), we will first address the plaintiff's second argument, which raises an issue of statutory interpretation.

> The interpretation of a statute is to be decided ultimately by this court. The ordinary rules of statutory construction apply to our review of the Right-to-Know Law, and we accordingly look to the plain meaning of the words used. To advance the purposes of the Right-to-Know Law, we construe provisions favoring disclosure broadly and exemptions narrowly.

Union Leader Corp. v. City of Nashua, 141 N.H. 473, 475 (1996) (quotation and citations omitted).

At issue is the interpretation of RSA 91-A:5, IV, which provides, in pertinent part, an exemption from disclosure under the Right-to-Know Law for:

> Records pertaining to internal personnel practices; confidential, commercial, or financial information; test questions, scoring keys, and other examination data used to administer a licensing examination, examination for employment, or academic examinations; and personnel, medical, welfare, library user, videotape sale or rental, and other files whose disclosure would constitute invasion of privacy.

RSA 91-A:5, IV. The trial court, relying upon our decisions in Union Leader Corp. v. Fenniman, 136 N.H. 624 (1993), and Hounsell v. North Conway Water Precinct, 154 N.H. 1 (2006), found that the subject of the investigative records at issue "directly involved the Rockingham County Attorney's Office's personnel practices."

The plaintiff argues that the trial court erroneously "applied a subject matter exemption contrary to the plain language of RSA 91-A:5[,] IV." In particular, the plaintiff contends that the "operative term" in the exemption at issue is "internal," and argues that the trial court both "failed to give weight" to that term and interpreted the statute so as to render the term superfluous. Fundamentally, the plaintiff's argument is that records of the defendant's

6

investigation of Reams do not "pertain[] to <u>internal</u> personnel practices," RSA 91-A:5, IV (emphasis added), because "[t]he Attorney General is simply not the County Attorney's employer." We agree with the plaintiff's statutory interpretation and, therefore, we vacate and remand for further proceedings. To explain our reasoning, however, we must first examine the two cases upon which the trial court relied.

The first is <u>Fenniman</u>, in which the plaintiff sought the disclosure under the Right-to-Know Law of "certain investigatory documents under the control of" the Dover Police Department and its chief. <u>Fenniman</u>, 136 N.H. at 625. The documents had been "compiled during an internal investigation of a department lieutenant accused of making harassing phone calls." <u>Id</u>. We held that the documents fell within the exemption for "[r]ecords pertaining to internal personnel practices" under RSA 91-A:5, IV. <u>Id</u>. at 626 (quotation omitted).

We noted that "[t]his particular portion of . . . [the statute had] not been construed by this court and is neither explained nor defined by the statute," and, therefore, we relied upon the plain meaning of the words used. <u>Id</u>. We stated that "[a]lthough we generally interpret the exemptions in RSA chapter 91-A restrictively to further the purposes of the Right-to-Know Law, the plain meanings of the words 'internal,' 'personnel,' and 'practices' are themselves quite broad." <u>Id</u>. at 626 (citation omitted). <u>But</u> <u>cf.</u>, <u>e.g.</u>, <u>Union Leader Corp. v. N.H. Housing Fin. Auth.</u>, 142 N.H. 540, 552 (1997) (stating that "[a]n expansive construction of the[] terms ['confidential, commercial, or financial' in RSA 91-A:5, IV] must be avoided, since to do otherwise would allow the exemption to swallow the rule and is inconsistent with the purposes and objectives of RSA chapter 91-A" (quotation and brackets omitted)). We then concluded that the files at issue "plainly 'pertain[] to internal personnel practices' because they document procedures leading up to internal personnel discipline, a quintessential example of an internal personnel practice." <u>Fenniman</u>, 136 N.H. at 626. We further held that "[a]lthough we have often applied a balancing test to judge whether the benefits of nondisclosure outweigh the benefits of disclosure, such an analysis is inappropriate where, as here, the legislature has plainly made its own determination that certain documents are categorically exempt." <u>Id</u>. at 627 (citations omitted).

As the foregoing demonstrates, in interpreting the "internal personnel practices" exemption in <u>Fenniman</u>, we twice departed from our customary Right-to-Know Law jurisprudence by declining to interpret the exemption narrowly and declining to employ a balancing test in determining whether to apply the exemption. In addition, we did not interpret the portion of RSA 91-A:5, IV at issue in the context of the remainder of the statutory language—in particular, the language exempting "personnel . . . and other files whose disclosure would constitute invasion of privacy." RSA 91-A:5, IV; <u>see</u> <u>Appeal of Cover</u>, 168 N.H. 614, 618 (2016) (noting that when interpreting a statute, "we

7

do not consider words and phrases in isolation, but rather within the context of the statute as a whole" (quotation omitted)). Thus, we did not examine whether a broad, categorical interpretation of "internal personnel practices" might render the exemption for "personnel . . . files whose disclosure would constitute invasion of privacy" in any way redundant or superfluous. See Winnacunnet Coop. Sch. Dist. v. Town of Seabrook, 148 N.H. 519, 525-26 (2002) (noting that "[w]hen construing a statute, we must give effect to all words in [the] statute and presume that the legislature did not enact superfluous or redundant words"); cf. Shapiro v. U.S. Dept. of Justice, 153 F. Supp. 3d 253, 280 (D.D.C. 2016) (noting that "Exemption 6 [of the federal Freedom of Information Act], which shields 'personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal [privacy]' . . . would have little purpose if agencies could simply invoke Exemption 2 [which shields, inter alia, records that relate solely to internal personnel rules and practices] to protect any records that are used only for 'personnel'-related purposes").

Moreover, although the practice of consulting decisions from other jurisdictions interpreting similar statutes is common in our Right-to-Know Law jurisprudence, we did not conduct such an inquiry in Fenniman. See, e.g., Murray v. N.H. Div. of State Police, 154 N.H. 579, 581 (2006) (noting that in interpreting the Right-to-Know Law, "[w]e also look to the decisions of other jurisdictions, since other similar acts, because they are in pari materia, are interpretatively helpful, especially in understanding the necessary accommodation of the competing interests involved" (quotation omitted)). Specifically, we have looked to federal law, see, e.g., Montenegro v. City of Dover, 162 N.H. 641, 650 (2011), having noted that "[t]he exemption provisions of our right-to-know law, RSA 91-A:5, IV (supp.), are similar to the Federal Freedom of Information Act, 5 U.S.C.A. [§] 552(b)(2), (4) and (6)," Mans v. Lebanon School Bd., 112 N.H. 160, 162-63 (1972).

The Freedom of Information Act (FOIA) exemption contained in 5 U.S.C. § 552(b)(2) is worded similarly to the portion of RSA 91-A:5, IV at issue here; specifically, it exempts from disclosure under the FOIA matters "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2) (2012). Nevertheless, our construction of the "internal personnel practices" exemption in RSA 91-A:5, IV is markedly broader than the United States Supreme Court's interpretation of that exemption's federal counterpart. See Dept. of Air Force v. Rose, 425 U.S. 352, 369-70 (1976) (noting that "the general thrust of the [5 U.S.C. § 552(b)(2)] exemption is simply to relieve agencies of the burden of assembling and maintaining for public inspection matter in which the public could not reasonably be expected to have an interest");[3] Milner v. Department of Navy, 562 U.S. 562, 566 (2011) (reaffirming

---

[3] The Rose Court relied upon the Senate Report on the bill enacted and codified as 5 U.S.C. § 552(b)(2), Rose, 425 U.S. at 367, which gave, as examples of material covered by Exemption

8

the narrow scope of Exemption 2 by rejecting a line of federal cases recognizing a so-called "High 2" exemption for "any predominantly internal materials whose disclosure would significantly risk circumvention of agency regulations or statutes" (quotations, citation, footnote and brackets omitted)).[4]

We continued our broad interpretation of RSA 91-A:5, IV's "internal personnel practices" exemption in the second case relied upon by the trial court: Hounsell v. North Conway Water Precinct. Hounsell involved a Right-to-Know Law request for an investigative report prepared for the defendant North Conway Water Precinct (precinct) by outside investigators. Hounsell, 154 N.H. at 2-3. Specifically, following an allegation by a precinct employee "that he had been threatened and harassed by a co-worker," the precinct's legal counsel "retained Jack Hunt and John Alfano to investigate the complaint." Id. at 2. Hunt and Alfano interviewed precinct employees and then "prepared a report in which they summarized the investigation and made findings and recommendations (Hunt-Alfano report)." Id.

We affirmed the trial court's denial of the Right-to-Know petition, id. at 7, holding, in relevant part, that, "as in Fenniman, the Hunt-Alfano report, which was generated in the course of an investigation of claimed employee misconduct, was a record pertaining to 'internal personnel practices.'" Id. at 4. We also rejected the petitioners' contention that "the investigation lost its 'internal status' because," among other things, "the precinct contracted with outside investigators." Id. at 5. We found that argument "unpersuasive . . . because nothing in the plain language of RSA 91-A:5, IV restricts a public body or agency from asserting an exemption under these circumstances, and the petitioners have presented no legal authority in support of their contentions." Id. at 5.

Against this legal backdrop, we now consider whether the "internal personnel practices" portion of RSA 91-A:5, IV exempts the materials at issue. Neither party has asked us to reconsider Fenniman or Hounsell, and we will not do so sua sponte. At this juncture, stare decisis impels us to follow Fenniman and Hounsell in treating "procedures leading up to internal personnel discipline"—in particular, an investigation into employee misconduct—as a personnel practice. Fenniman, 136 N.H. at 626. Nevertheless, we decline to extend Fenniman and Hounsell beyond their own

2, "'rules as to personnel's use of parking facilities or regulations of lunch hours, statements of policy as to sick leave, and the like.'" Id. at 363 (quoting S. Rep. No. 813, 89th Cong., 1st Sess., 8 (1965)).

[4] In so holding, the Court stated that "Exemption 2, consistent with the plain meaning of the term 'personnel rules and practices,' encompasses only records relating to issues of employee relations and human resources." Milner, 562 U.S. at 581. While this statement may appear to suggest a broader interpretation of Exemption 2 than that in Rose, it has been noted that "[t]he modest difference in judicial approaches taken in the Rose and Milner decisions does not come close to undermining the Rose holding." Shapiro, 153 F. Supp. 3d at 279.

factual contexts and, in further interpreting RSA 91-A:5, IV herein, we return to our customary standards for construing the Right-to-Know Law.

The plaintiff distinguishes Hounsell by noting that in that case, "the investigators had been retained by the employer and acted on behalf of the employer." He argues that "[t]he mere fact that an investigation could result in disciplinary action, standing alone, is not enough to qualify an investigation as a record pertaining to 'internal personnel practices.'" We agree that Hounsell is distinguishable and that the distinction turns upon the statutory term "internal." RSA 91-A:5, IV.

"When interpreting a statute, we first look to the plain meaning of the words used and will consider legislative history only if the statutory language is ambiguous." Union Leader Corp. v. N.H. Retirement Sys., 162 N.H. 673, 676 (2011) (quotation omitted). In Fenniman, we stated that "the plain meanings of the words 'internal,' 'personnel,' and 'practices' are . . . quite broad," but went no further in defining or examining those terms. Fenniman, 136 N.H. at 626. Looking now to how the words are used in the statute, we note that the terms "internal" and "personnel" modify the word "practices," thereby circumscribing the provision's scope. Cf. Milner, 562 U.S. at 569 (observing that 5 U.S.C. § 552(b)(2) uses the term "'personnel' . . . as an adjective . . . to modify 'rules and practices'" and that the term is "the one that most clearly marks the provision's boundaries").

In construing the term "personnel" as used in the FOIA, the Supreme Court noted that "[w]hen used as an adjective, . . . th[e] term refers to human resources matters. 'Personnel,' in this common parlance, means 'the selection, placement, and training of employees and . . . the formulation of policies, procedures, and relations with [or involving] employees or their representatives.'" Id. (quoting Webster's Third New International Dictionary 1687 (1966)). The Court accordingly determined that "[a]n agency's 'personnel rules and practices,'" for purposes of exemption 2 of the FOIA, "are its rules and practices dealing with employee relations or human resources. . . . They concern the conditions of employment in federal agencies—such matters as hiring and firing, work rules and discipline, compensation and benefits." Id. at 570. In general, then, the term "personnel" relates to employment. Indeed, this is the meaning we implicitly gave the term in Fenniman and Hounsell. See, e.g., Hounsell, 154 N.H. at 4 (noting that, "as in Fenniman, the Hunt-Alfano report, which was generated in the course of an investigation of claimed employee misconduct, was a record pertaining to 'internal personnel practices'" (emphasis added)).

"Internal" is defined to mean "existing or situated within the limits . . . of something." Webster's Third New International Dictionary 1180 (unabridged ed. 2002). Employing the foregoing definitions, we construe "internal personnel practices," to mean practices that "exist[] or [are] situated within the

10

limits" of employment.  Id.  Accordingly, while we follow Fenniman and Hounsell in treating an investigation into employee misconduct as a personnel practice, we now clarify that the investigation must take place within the limits of an employment relationship.  In other words, the investigation must be conducted by, or as in Hounsell, on behalf of,[5] the employer of the investigation's target.  See Hounsell, 154 N.H. at 2, 4-5.  Such a construction is not only consistent with the plain language of RSA 91-A:5, IV, but also follows our practice of "resolv[ing] questions regarding the Right-to-Know law with a view to providing the utmost information in order to best effectuate the statutory and constitutional objective of facilitating access to all public documents."  N.H. Retirement Sys., 162 N.H. at 676 (quotation and brackets omitted).

The plaintiff argues that the investigation into Reams's alleged misconduct was not an "internal" one because it was conducted by the defendant, who was not Reams's employer.  The defendant neither directly asserts that he was Reams's employer nor explicitly concedes that he was not.  Rather, the defendant contends that the attorney general's interests "in the effective operation of the [Rockingham County Attorney's Office] do not differ from the interests of an employer."  The defendant further asserts that the plaintiff's "argument that the records are not exempt because the [attorney general's office] did not employ the witnesses at issue is . . . in error because an investigation into management and operational issues that impact the office's prosecutorial effectiveness is within the [attorney general's office's] statutory authority."

We have not previously decided whether the county attorneys are employees of the attorney general.  Cf. State v. Dexter, 136 N.H. 669, 673 (1993) (finding it unnecessary to decide, even assuming attorney's fees were recoverable for county attorney's alleged bad faith litigation, whether such fees would be "properly recoverable from the State or the county").  In Samaha v. Grafton County, 126 N.H. 583 (1985), we held that the plaintiff, when employed as clerk of superior court sitting in Grafton County, "was not an employee of Grafton County."  Samaha, 126 N.H. at 586.  We reasoned:

> In determining whether an employer-employee relationship exists, courts generally consider factors such as managerial and fiscal control.  During his service there, the county did not have the right to exercise fiscal or managerial control over the plaintiff, nor the power to set his salary, hire or fire him.  These functions were

---

[5] In Hounsell, the precinct's legal counsel "retained" the outside third parties "to investigate [an employee's] complaint of harassment" by a co-worker.  Hounsell, 154 N.H. at 2.  The implication is that the outside investigators neither initiated the investigation nor conducted it for their own purposes, but rather, that they acted solely on behalf of the precinct.  See id.

performed by the superior court, acting as a body.  RSA 499:1, :12.
N.H. [CONST.] pt. II, art. 82.

Id. (citations omitted).

Considering the factors we employed in Samaha with respect to the
instant case, we note that the attorney general does not hire county attorneys.
Rather, each county attorney is "elected biennially by the voters of the county."
RSA 7:33 (2013); see also RSA 653:1, V (2016).  Vacancies or temporary
absences in the office of county attorney are filled either by the superior court
or by majority vote of the members of the county convention, in accordance
with the provisions of RSA 7:33 and RSA 661:9 (2016).  Nor does the attorney
general have the authority to fire a county attorney.  See Eames v. Rudman,
115 N.H. 91, 93 (1975) (noting that attorney general has no power to remove
the county attorney from office).  The attorney general may "temporarily
suspend [a] county attorney from exercising his criminal law enforcement
authority," but the "power to remove [a] county attorney from office . . . is
vested in the superior court."  Id. at 91, 93; RSA 661:9, IV (providing that "[a]ny
officer of a county . . . may be removed by the superior court for official
misconduct").  Finally, the attorney general neither sets nor pays the county
attorneys' salaries.  See RSA 23:7 (2000) (providing, in part, that "[e]very
county convention shall have the power to establish salaries, benefits and other
compensation paid to elected county officers including the county attorney");
RSA 23:5 (2000) (providing that "[t]he salaries of county attorneys . . . shall be
paid from the county treasury in equal payments as determined by the county
commissioners").

As the defendant points out, however, the attorney general does possess
some supervisory authority over county attorneys.  See Wyman v. Danais, 101
N.H. 487, 490 (1958).  RSA 7:6 provides, in part, that "[t]he attorney general
shall have and exercise general supervision of the criminal cases pending
before the supreme and superior courts of the state, and with the aid of the
county attorneys, the attorney general shall enforce the criminal laws of the
state."  RSA 7:6.  "RSA 7:11 provides that officers charged with enforcing
criminal law 'shall be subject to the control of the attorney general whenever in
the discretion of the latter he shall see fit to exercise the same.'"  Wyman, 101
N.H. at 489 (quoting RSA 7:11) (emphasis omitted); see RSA 7:11.  Similarly,
RSA 7:34 specifies that "[t]he county attorney of each county shall be under the
direction of the attorney general."  RSA 7:34.  "Construed together," the above-
cited provisions "demonstrate a legislative purpose to place ultimate
responsibility for criminal law enforcement in the Attorney General, and to give
him the power to control, direct and supervise criminal law enforcement by the
county attorneys in cases where he deems it in the public interest."  Wyman,
101 N.H. at 490.  Nevertheless, the prosecution of criminal cases under the
supervision of the attorney general is not the sole duty or function of a county
attorney.  "Although the county attorney . . . may be engaged primarily in

12

criminal prosecutions, his duties and functions also include civil litigations for the county and other miscellaneous civil matters." New Hampshire Bar Ass'n v. LaBelle, 109 N.H. 184, 185 (1968) (citation omitted); see RSA 7:34 (providing that "[i]f no other representation is provided, under the direction of the county commissioners [the county attorney] shall prosecute or defend any suit in which the county is interested").

Because the relationship between the attorney general and a county attorney lacks the usual attributes of an employer-employee relationship, such as the "power to set [the] salary, hire or fire," Samaha, 126 N.H. at 586, we agree with the plaintiff that the defendant was not Reams's employer. We further conclude that the attorney general's supervisory authority over criminal law enforcement by the county attorney is not sufficient, in light of the absent characteristics noted above, to warrant treating the defendant as Reams's employer for purposes of the "internal personnel practices" exemption.

We need not decide, and express no opinion upon, whether the Rockingham County Commissioners could be considered Reams's employer for purposes of the "internal personnel practices" exemption as applied in Hounsell, nor must we address the plaintiff's argument that the trial court erred in finding that the defendant's investigation of Reams was "conducted jointly with Rockingham County." As noted above, an investigation is "internal," as applied in Hounsell, if conducted on behalf of the employer of the investigation's target. See Hounsell, 154 N.H. at 2, 4-5. Mere joint participation is not sufficient. Cf. id.

The defendant makes no argument on appeal that it acted as agent or outside counsel to the Rockingham County Commissioners such that its investigation should be treated as conducted on their behalf for purposes of the "internal investigation exemption" as applied in Hounsell. Rather, although the defendant maintains that it viewed its investigation as "a joint investigation with Rockingham County," it "does not claim that the fact that the investigation was conducted with Rockingham County is what justifies the application of RSA 91-A:5, IV's personnel exemptions." Accordingly, because a finding of joint participation with the county commissioners would not affect our decision, we decline to address the plaintiff's third claim of error; moreover, because the trial court applied RSA 91-A:5, IV's "internal personnel practices" exemption to records of an investigation conducted outside the limits of an employment relationship, we vacate its decision.

The defendant nevertheless contends that "the protection provided by the RSA chapter 91-A personnel exemptions is not for the benefit of the employer, but for the benefit of protecting the privacy rights of the employee." Thus, he argues: "[T]he fact that the [attorney general's office's] investigation occurred does not divest the affected [Rockingham County Attorney's Office] employees of their right to have their personnel information protected."

The defendant's argument does not alter our above conclusion, but, rather, highlights that whether the disputed material may be withheld should more properly be addressed under the portion of RSA 91-A:5, IV that exempts "personnel, medical, . . . and other files whose disclosure would constitute invasion of privacy." RSA 91-A:5, IV; see N.H. Right to Life v. Dir., N.H. Charitable Trusts Unit, 169 N.H. 95, 110 (2016) (noting that "[t]his section of the Right-to-Know Law means that financial information and personnel files and other information necessary to an individual's privacy need not be disclosed" (quotation omitted)). Similarly, we decline to consider at this time the defendant's contention that the "transfer of personnel information from the [Rockingham County Attorney's Office] to the [attorney general's office] does not alter the fact that the information is substantively personnel in nature," because we believe that argument, too, is more suited to an analysis under the "personnel, medical . . . and other files" exemption. RSA 91-A:5, IV; cf. U.S. Dept. of State v. Washington Post Co., 456 U.S. 595, 601 (1982) (stating, in broadly construing the term "similar files" in the FOIA's Exemption 6, that "information about an individual should not lose the protection of Exemption 6 merely because it is stored by an agency in records other than 'personnel' or 'medical' files").

As previously noted, the defendant claimed a number of exemptions for the information he withheld or redacted, including an exemption for a category of materials he called "Personnel Information." (Bolding omitted.) The defendant asserted: "Under RSA 91-A:5, IV, records related to internal personnel practices are exempt from disclosure under Right to Know. In addition, personnel records are also exempt." Thus, it appears that the defendant claimed exemption under both personnel-related exemptions in RSA 91-A:5, IV—the exemption for "[r]ecords pertaining to internal personnel practices"—and the exemption for "personnel . . . files whose disclosure would constitute invasion of privacy." RSA 91-A:5, IV.

The trial court also seems to have recognized two personnel-related exemptions, as it noted that RSA 91-A:5, IV exempts "'[r]ecords pertaining to internal personnel practices,' as well as employees' personnel files." The court's decision, however, appears to be based exclusively on the "internal personnel practices" exemption, and it is not evident that the court considered whether any of the disputed materials were exempt as "personnel . . . files whose disclosure would constitute invasion of privacy." RSA 91-A:5, IV. Accordingly, on remand, the parties may litigate whether any of the disputed materials fall within the latter exemption and we leave it to the trial court to make that determination in the first instance.

For the benefit of the parties and the court on remand, we provide the following guidance. Although we have not specifically interpreted the exemption for "personnel . . . files whose disclosure would constitute invasion of privacy," RSA 91-A:5, IV, we have had occasion to "define with some

14

specificity the statutory exemption for 'confidential, commercial, or financial information'" in the same provision.  N.H. Housing Fin. Auth., 142 N.H. at 552.  We noted that "[w]e have interpreted our statute . . . as requiring analysis of both whether the information sought is 'confidential, commercial, or financial information,' and whether disclosure would constitute an invasion of privacy."  Id.  Similarly, we now hold that the determination of whether material is subject to the exemption for "personnel . . . files whose disclosure would constitute invasion of privacy," RSA 91-A:5, IV, also requires a two-part analysis of: (1) whether the material can be considered a "personnel file" or part of a "personnel file"; and (2) whether disclosure of the material would constitute an invasion of privacy.  Cf., e.g., Rugiero v. U.S. Dept. of Justice, 257 F.3d 534, 550 (6th Cir. 2001) (describing similar two-part test for exemption under the FOIA for personnel, medical and similar files); Rocque v. Freedom of Information Com'n, 774 A.2d 957, 963-64 (Conn. 2001) (describing similar two-part test for exemption under Connecticut's Freedom of Information Act for personnel, medical or similar files).  Accordingly, in analyzing the "personnel . . . files" exemption on remand, the trial court must first determine whether any of the disputed material is, or is contained in, a personnel file.  If not, the "personnel . . . files" exemption does not apply.[6]  Cf. Abbott v. Dallas Area Rapid Transit, 410 S.W.3d 876, 883-84 (Tex. App. 2013) (noting that exemption under Texas Public Information Act for "'information in a personnel file, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy'" did not apply to information at issue where there was "no evidence in the record before us that [Dallas Area Rapid Transit's] investigation report [regarding an employee's racial discrimination complaint against two co-employees] is in the interviewees' personnel files").

The analysis of whether the exemption for "personnel . . . files" applies next requires determining whether disclosure of any material meeting the first prong of the inquiry would constitute an invasion of privacy.  We now clarify that, unlike materials pertaining to "internal personnel practices," for which we eschewed the customary balancing test in Fenniman, "personnel . . . files" are not automatically exempt from disclosure.  RSA 91-A:5, IV.  For those materials, "th[e] categorical exemption[] [in RSA 91-A:5, IV] mean[s] not that the information is per se exempt, but rather that it is sufficiently private that it must be balanced against the public's interest in disclosure."  N.H. Housing Fin. Auth., 142 N.H. at 553 (discussing RSA 91-A:5, IV exemption for "confidential, commercial, or financial information").  Specifically, "[w]e engage

---

[6] We again note that the defendant claimed a number of exemptions for its withholding and redaction of information subject to the plaintiff's Right-to-Know Law request, including an exemption for "Personal Information."  (Bolding omitted.)  In particular, the defendant claimed an exemption for "records whose disclosure would constitute an invasion of privacy."  (Quotation omitted.)  To the extent that claim was intended to be an invocation of the exemption for "other files whose disclosure would constitute invasion of privacy," we express no opinion upon the scope or application of that claimed exemption and our decision herein has no effect upon the defendant's ability to assert such a claim on remand.  RSA 91-A:5, IV (emphasis added).

15

in a three-step analysis when considering whether disclosure of public records constitutes an invasion of privacy under RSA 91-A:5, IV." N.H. Right to Life, 169 N.H. at 110.

> The three-step analysis is well-established:
>
> First, we evaluate whether there is a privacy interest at stake that would be invaded by the disclosure. . . . If no privacy interest is at stake, the Right-to-Know Law mandates disclosure.
>
> Second, we assess the public's interest in disclosure. Disclosure of the requested information should inform the public about the conduct and activities of their government. . . .
>
> Finally, we balance the public interest in disclosure against the government's interest in nondisclosure and the individual's privacy interest in nondisclosure.

Lambert v. Belknap County Convention, 157 N.H. 375, 382-83 (2008) (citations omitted).

The defendant does not appear to assert a privacy interest on behalf of Reams,[7] but rather cites "the privacy rights of the former and present [Rockingham County Attorney's Office] employees who provided their [employment-related] information, including allegations of sexual harassment, pregnancy discrimination, discipline, and retaliation to [attorney general's office] investigators." Looking to cases from other jurisdictions for guidance, see Murray, 154 N.H. at 581, we note that federal courts applying the FOIA have recognized that "[w]itnesses who cooperate with internal investigations concerning alleged employee violations do have privacy interests at stake." Fine v. U.S. Dept. of Energy, 823 F. Supp. 888, 897 (D.N.M. 1993); see also Cappabianca v. Commissioner, U.S. Customs Service, 847 F. Supp. 1558, 1564 (M.D. Fla. 1994) (noting that "[w]itnesses and co-workers have legitimate privacy interests in the nondisclosure of their identities and in keeping their participation in an investigation confidential"). In addition, a public interest in nondisclosure has been noted where records relate to the investigation of alleged wrongdoing by public employees. Thus, in analyzing the FOIA exemption for "'investigatory records compiled for law enforcement purposes,'" whose production would "'constitute an unwarranted invasion of personal privacy,'" the court in Fine recognized "a strong public interest in protecting the

---

[7] Because the trial court appears not to have engaged in the balancing test for an exemption involving an asserted invasion of privacy, or made any ruling on that issue that is now before us on appeal, we do not address whether the defendant's brief fully develops his privacy claim. Thus, nothing in the guidance we provide herein is intended to constrain the scope of the defendant's claims or arguments on remand.

16

privacy of persons who have cooperated with internal investigations of possible improper conduct by fellow employees." Fine, 823 F. Supp. at 907-08 (quoting 5 U.S.C. § 552(b)(7)(C)(1977)). Although these cases provide helpful guidance, we note that they are arguably distinguishable from this case because, as explained above, the investigation by the attorney general's office was not an "internal" one.

We have not yet considered the nature of any privacy interest that might be asserted under the precise circumstances at issue here. The privacy inquiry under the comparable provision of the FOIA (Exemption 6), however, has been noted to be "essentially the same," Judicial Watch, Inc. v. Dept. of Justice, 365 F.3d 1108, 1125 (D.C. Cir. 2004), as the privacy inquiry under the FOIA's exemption for investigatory records "compiled for law enforcement purposes," to the extent their production "could reasonably be expected to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C) (2012). Cf. Judicial Watch, Inc., 365 F.3d at 1125 (also noting, however, that the Supreme Court has construed the 7C exemption to be broader than Exemption 6).

We addressed a law enforcement exemption under the Right-to-Know Law in City of Nashua, where we recognized "that there may be strong privacy interests . . . in law enforcement investigatory records." City of Nashua, 141 N.H. at 477. We cited cases from other jurisdictions noting that disclosure of such records could subject individuals to stigma, embarrassment, and reputational injury. Id. at 477-78. Similarly, the FOIA's Exemption 6 has been held to apply to the "kinds of facts [that] are regarded as personal because their public disclosure could subject the person to whom they pertain to embarrassment, harassment, disgrace, loss of employment or friends." Brown v. Federal Bureau of Investigation, 658 F.2d 71, 75 (2d Cir. 1981) (determining whether documents were "similar files" under Exemption 6 of the FOIA); see also Washington Post Co., 456 U.S. at 599 (noting that legislative history suggests that the "primary purpose . . . [of] Exemption 6 was to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information"). Thus, in determining whether any privacy interests are at stake in the disputed materials, the trial court should consider whether disclosure would subject an individual to the kind of embarrassment or reputational harm described above.

Moreover, "[w]hether information is exempt from disclosure because it is private is judged by an objective standard and not by a party's subjective expectations." N.H. Retirement Sys., 162 N.H. at 679 (quotation omitted); cf. Lambert, 157 N.H. at 383 (noting that candidate for an elected office "could not have reasonably expected to keep his or her 'application' private"). As Lambert suggests, however, the nature of the information itself may bear upon whether it can be considered private for purposes of RSA 91-A:5, IV. See Lambert, 157 N.H. at 383. Thus, information that, under an objective standard, would be expected to become public in due course, should not give rise to the same

privacy interest as information for which public exposure would, objectively, never be anticipated. Here, it may be that certain information regarding allegations of misconduct potentially rising to the level of criminal actions by an elected official could objectively have been expected to become public as or after an investigation ran its course.

We recognize case law holding that "[a] clear privacy interest exists with respect to such information as names, addresses, and other identifying information even where such information is already publicly available," Rugiero, 257 F.3d at 550, and that "[a] witness does not waive his or her interest in personal privacy [even] by testifying at a public trial," Sellers v. U.S. Dept. of Justice, 684 F. Supp. 2d 149, 160 (D.D.C. 2010) (discussing the FOIA exemption for records compiled for purposes of law enforcement). Nevertheless, we note that the privacy interest in a witness's or investigation interviewee's name and identifying information will likely differ from the privacy interest in the substantive information the witness or interviewee imparts. Cf. CREW v. U.S. Dept. of Justice, 978 F. Supp. 2d 1, 11 (D.D.C. 2013) (CREW I) (finding, with respect to investigative files on senator's alleged criminal actions taken to cover up an extramarital affair, that third parties mentioned in files, such as informants, witnesses, and investigators, "lack a privacy interest in the substance of the files, unless the substance could reveal their identities").

In contrast to CREW I, id., however, and given the nature of Reams's alleged misconduct, we cannot say as a matter of law that third party witnesses and interviewees in this case will have no privacy interest in any of the substantive information. Cf. Rocque, 774 A.2d at 959 (agreeing with trial court "that the identity of the complainant in the sexual harassment investigation at issue . . . [and] certain other information concerning the investigation is exempt from disclosure" but "limit[ing] the exempt portions of the records to those comprising sexually descriptive information"). On the other hand, even information imbued with a legitimate privacy interest is subject to disclosure if, on balance, that interest is outweighed by the public's cognizable interest in disclosure. Cf. CREW I, 978 F. Supp. 2d at 12 (noting that "[a]lthough the [defendant, Department of Justice (DOJ),] argues that Senator Ensign's alleged misconduct 'is of a highly personal nature,' the public has a substantial interest in DOJ's decision not to prosecute him, considering the circumstances"). Accordingly, we emphasize that a fact-specific inquiry is required in each case. Cf. Rocque, 774 A.2d at 959 (disagreeing with "trial court's ruling that the identity of a complainant in a sexual harassment complaint and related information are always exempt from disclosure, irrespective of the particular facts of a case").

Turning to the second step of the balancing test, the plaintiff claims a "public interest in determining if the Attorney General had grounds to unilaterally remove an elected official . . . [and] in disclosing the information relied upon by the Attorney General." We recognize that "[t]he public has a

significant interest in knowing that a government investigation is comprehensive and accurate." <u>Fine</u>, 823 F. Supp. at 898. We also note that the rank of the official being investigated and the seriousness of the alleged misconduct will bear upon the strength of the public interest. <u>Cf</u>. <u>Coleman v. Lappin</u>, 680 F. Supp. 2d 192, 199 (D.D.C. 2010) (stating that "[t]he Court ordinarily considers, when balancing the public interest in disclosure against the private interest in exemption, the rank of the public official involved and the seriousness of the misconduct alleged" (quotation and brackets omitted)). Thus, for instance, the court in <u>CREW v. U.S. Dept. of Justice</u>, 840 F. Supp. 2d 226 (D.D.C. 2012) (<u>CREW II</u>), found it "difficult to understand how there could not be a substantial public interest in disclosure of documents regarding the manner in which the [Department of Justice] handled high profile allegations of public corruption about an elected official." <u>CREW II</u>, 840 F. Supp. 2d at 234.

The legitimacy of the public's interest in disclosure, however, is tied to the Right-to-Know Law's purpose, which is "to provide the utmost information to the public about what its government is up to." <u>N.H. Right to Life</u>, 169 N.H. at 111 (quotation omitted). "If disclosing the information does not serve this purpose, disclosure will not be warranted even though the public may nonetheless prefer, albeit for other reasons, that the information be released." <u>Lamy v. N.H. Pub. Utils. Comm'n</u>, 152 N.H. 106, 111 (2005) (quotation omitted). Conversely, "an individual's motives in seeking disclosure are irrelevant to the question of access." <u>Lambert</u>, 157 N.H. at 383.

The third step requires balancing "the public interest in disclosure against the government's interest in nondisclosure and the individual's privacy interest in nondisclosure." <u>Id</u>. We have stated that "[t]he legislature has provided the weight to be given one side of the balance[] [by] declaring the purpose of the Right-to-Know Law in" the statute itself. <u>City of Nashua</u>, 141 N.H. at 476. Specifically, the preamble to RSA chapter 91-A provides: "Openness in the conduct of public business is essential to a democratic society. The purpose of this chapter is to ensure both the greatest possible public access to the actions, discussions and records of all public bodies, and their accountability to the people." RSA 91-A:1 (2013). Thus, "[w]hen a public entity seeks to avoid disclosure of material under the Right-to-Know Law, that entity bears a heavy burden to shift the balance toward nondisclosure." <u>City of Nashua</u>, 141 N.H. at 476.

The foregoing considerations are not intended to be either comprehensive or exhaustive, and we leave it to the trial court, in the first instance, to determine and weigh the applicable interests as the case may require on remand.

In light of the foregoing, our decision is not undermined by the defendant's contention, and the trial court's consonant finding, that this case implicates the policy concern noted in <u>Hounsell</u>; namely, that "disclosure of

records underlying, or arising from, internal personnel investigations would deter the reporting of misconduct by public employees, or participation in such investigations, for fear of public embarrassment, humiliation, or even retaliation." Hounsell, 154 N.H. at 5. We are confident that the proper balancing of the employees' interests in privacy and the State's interest in nondisclosure against the public's interest in disclosure under our established test adequately addresses any concerns about deterrence. Cf. Goode v. N.H. Legislative Budget Assistant, 148 N.H. 551, 556 (2002) (acknowledging "a possibility that an audit investigation may be compromised if interviewees are reluctant to disclose information to investigators" out of concern "that their responses could be released to the public," but finding that this possibility did "not . . . outweigh[] the public's interest in disclosure").

In light of our decision, we need not address the plaintiff's constitutional argument. See Chatman, 163 N.H. at 326.

Vacated and remanded.

HICKS, CONBOY, and BASSETT, JJ., concurred.